Judge Joy Cossich Lobrano
Defendant, Tavis Leonard ("Defendant"), appeals his convictions for second degree murder, armed robbery, and attempted manslaughter. After reviewing the record and applicable law, we affirm Defendant's convictions.
PROCEDURAL BACKGROUND
On June 25, 2015, the State indicted Defendant for the second degree murders of Charles Meyers (count 1) and Michael Meyers (count 4); the attempted second degree murders of Christopher Dorsey (count 2) and Torran Stewart (count 5); and the armed robbery of Christopher Dorsey and Charles Meyers (count 3). Defendant pled not guilty to all charges.
The State elected to go to trial on counts 1, 2, and 3, only. The trial lasted two days and concluded with Defendant being found guilty as charged on counts 1 and 3, and guilty to the lesser charge of attempted manslaughter on count 2. Defendant's motion for new trial was denied.
Defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence (count 1); twenty years at hard labor (count 2); and ninety-nine years without benefit of parole, probation or suspension of sentence, plus five-years enhancement (count 3). The sentences were to be served concurrently, with the exception of the five-year firearm *382 enhancement, which would be served consecutively to the other sentences.
A motion for appeal was granted the same day.
TRIAL TESTIMONY
The trial testimony of co-defendant, Wade Reed, established the chronology of events of the March 26, 2014, the date of the crime in question.
Reed recalled that on March 25, 2014, Defendant, a close friend, solicited his participation in a plan to rob Christopher Dorsey. Reed said Dorsey's house was targeted because Defendant was aware, through Jonathan Holmes[1] that Dorsey was a drug dealer and kept large amounts of cash in his home.
The following day, Defendant, driving a white Volkswagen Beetle which he borrowed the night before from his friend, arrived at Reed's house. Reed and Defendant then drove to Dorsey's Briarheath Drive residence, arriving at about 8:00 a.m. They sat in the car for about an hour until Dorsey and his family left the residence.
Reed and Defendant went around the corner and jumped the back fence. However, Dorsey returned to his residence sooner than Wade and Defendant expected. Dorsey drove his vehicle into the backyard, where he was approached by the armed Defendant. Dorsey exited the truck and relinquished a "brick" of cocaine he was carrying. Defendant took Dorsey's house key and, while Defendant was walking to the front door, Charles Meyers drove up in his truck. Defendant removed Meyers from his vehicle at gunpoint and forced him into the backyard with Dorsey.
Reed opened the front door and admitted Defendant, Dorsey, and Meyers. By that time, Holmes had arrived and was admitted to the residence. While Defendant and Holmes searched the house for drugs and money, Reed confiscated cash concealed in Meyers' truck.
Dorsey told Reed he had $90,000 stashed in a sock hidden in a wall in the attic. Defendant retrieved the cash. Defendant then made Dorsey call his father, also a drug dealer, and request $250,000. At the same time, Reed and Holmes removed electronic equipment from the house and loaded it into the Volkswagen. All of the men left the house through the back door and entered Dorsey's black Avalanche truck. Reed tied Dorsey's and Meyers' hands behind their backs, got into the driver's seat, and confiscated the gun Dorsey kept in his truck. Dorsey sat next to Reed. Defendant, Meyers, and Holmes rode in the rear seat. As Reed drove down Hayne Boulevard, Holmes and Meyers began fighting over a gun. Reed stopped the truck because he feared being shot in the tussle. In the confusion, Meyers jumped out of the truck and ran. Holmes pursued Meyers, shooting at him. While Holmes shot at Meyers, Dorsey reached for Reed's weapon. As they grappled over the gun, Dorsey was shot once in the head and slumped over. At that point, Defendant jumped from the rear seat of the truck and ran to a waiting vehicle. Believing Dorsey was dead, Reed exited the truck. As Reed walked away, he heard the truck door *383 close and saw Dorsey driving away without them. Reed fired at the truck. Eventually, Reed and Holmes walked home.
Reed recalled that of all the money and drugs he, Defendant, and Holmes had taken from Dorsey, he received only $5,000.00, with an unfulfilled promise of more from Defendant. Reed also testified that Defendant's stepfather and step-grandfather had been murdered in January 2015.
Reed identified State's Exhibit 4 as the surveillance video from Dorsey's residence. While the video was played for the jury, Reed narrated the recording, identifying the people seen in the recording and explaining the activity depicted.
NOPD Detective Rayell Johnson, lead investigator in this case, arrived on the scene at 11700 Hayne Boulevard at approximately 10:00 a.m. on March 26, 2014. Johnson saw Meyers' body lying in the middle of the street. Several gunshot wounds were visible on the body. A bullet-riddled black Avalanche truck was parked a short distance away. Dorsey, who suffered a single gunshot wound to the head, had already been transported to the hospital.
Shell casings from .40 caliber and 9mm caliber ammunition were collected from the scene. The .40 caliber shells were found close to Myers' body and the 9mm casings were located near the intersection of Arcadia Lane and Hayne Boulevard. Ballistics testing showed that the 9mm ammunition was fired by Reed as he shot at Dorsey fleeing in a black truck.
After processing the scene, Johnson relocated to the hospital and spoke to Dorsey, who was unable to identify his assailants. However, Dorsey related the facts of the crimes consistent with Reed's testimony. The detective learned from Dorsey that Dorsey's Briarheath residence was a crime scene. Johnson identified photographs of the interior of the residence, showing the house had been ransacked. Johnson retrieved the home surveillance video, which was played for the jury. Johnson recalled that the events depicted in the video matched what Reed told him.
Explaining his investigation, that led to the development of Defendant, Reed, and Holmes as suspects, Johnson traced the ownership of the white Volkswagen Beetle seen in the home surveillance video to Defendant's friend's mother. Johnson spoke with the friend, who identified Defendant as the person to whom she loaned the vehicle. The friend said Defendant returned the car the day after the shooting.
Johnson testified that Reed and Holmes were identified by Dorsey from six-person photo lineups. However, Johnson was never able to present a photo line-up to Dorsey that included Defendant's photo.[2]
Johnson obtained Defendant's cell phone number from the friend and arranged to take a statement from him at Police Headquarters. In his statement, Defendant admitted that he and Reed were friends, although he did not associate with him. Further, he denied knowing anything about the murder of Meyers and the attempted murder of Dorsey. Defendant said he lived in Kenner and his stepfather, Desmond Lange, lived in Gentilly, so he had no reason to go to New Orleans East.
Johnson subpoenaed Defendant's cell phone records to track its activity at the time of the armed robbery and shooting.[3]
*384 Those records indicated that for two minutes prior to and two minutes after the murder, Defendant's cell phone "pinged" off the Sprint tower at Hayne Boulevard and Bullard Avenue, approximately two blocks from the scene of the murder. Moreover, the cell phone records indicated that Defendant's phone pinged off a cell tower in New Orleans East approximately twenty times during the time frame of the armed robbery and murder. The State played Defendant's statement in which Defendant denied knowledge of, and any involvement in, the incident, except to say he procured legal counsel for Reed.
The friend testified she had known Defendant for a few months by March of 2014. She knew Reed to be Defendant's friend. On the evening of March 25, 2014, she agreed to lend Defendant her white Volkswagen Beetle. He arranged to meet her at school to pick up the car. He said he needed the car for work and returned it to her the following afternoon. When Defendant returned the car, he told her something went "bad" and that: "If the police come looking for me [Defendant], tell them you don't know me." She identified her white Volkswagen parked in the driveway at 7458 Briarheath Drive when it appeared in the video surveillance. She was very upset when she learned Defendant used her car to commit a robbery.
Plaquemines Parish Detective Paul Durnin was assigned to the Criminal Intelligence Center (CIC) based in Jefferson Parish. Durnin explained that the CIC was composed of seventeen New Orleans law enforcement agencies which shared resources and intelligence in crime fighting. Durnin specialized in cell phone historical record analysis, such as the time, date, and duration of a cell phone call, the number was called, and the identification of the cell tower through which the call was routed.
Durnin performed an historical record analysis on Defendant's phone to determine the location of it for the time period of March 26, 2014, from 7:06 a.m. until 10:00 a.m. Durnin's report of his analysis indicated that the cell phone used the Sprint Tower cell phone tower 5600, located at the intersection of Hayne Boulevard and Bullard Avenue twenty-six times during the specified time period. The records analysis also showed that two minutes prior to the homicide, Defendant's cell phone made an outgoing call, and that three minutes after the homicide, Defendant's phone received an incoming call. The calls made and received in the five-minute period of time used Sprint Tower 5700.
Meredith Acosta, a firearms examiner for the Bureau of Alcohol, Tobacco and Firearms, was accepted as an expert in ballistics examination and identification. Acosta inspected ballistic evidence collected at the scene and generated a report of her findings. Acosta examined twelve .40 caliber shell casings and ten 9mm casings. Her testing revealed that two weapons were used in the shootings, and that all of the .40 caliber shell casings were discharged by the same weapon and the 9mm casings were fired by a different gun.
Dr. Samantha Huber, Chief Forensic Pathologist for the New Orleans coroner's office, performed an autopsy on Meyer's body and authored a report documenting her findings. According to Huber, the victim sustained eight gunshot wounds, two of which were fatal: one of the bullets pierced the victim's lungs and trachea, while the other hit the stomach, small bowel *385 and liver. Those wounds caused the victim to bleed to death.
Defendant testified he was twenty-two years old, lived in New Orleans his entire life and graduated from high school. He said although he referred to Desmond Lange as he his father, Lange was actually his stepfather. Defendant said that at the time of his arrest, he was working for Coca Cola and Central Parking on Poydras and Camp Streets in downtown New Orleans.
Defendant gave a statement to Johnson. He said Reed was a friend he had known for about seven years. Defendant denied any involvement in these incidents. When questioned about the white Volkswagen, Defendant claimed his friend requested that he take her car because she was spending the night before this incident on campus and did not have a parking pass to allow her to park her car there. She picked him up at his residence; they drove to the campus, and he drove her car to his stepfather's residence in Gentilly. Sometime later, Reed needed a ride, so Defendant loaned him the Volkswagen, which Reed returned to Defendant the following day. Defendant claimed he had forgotten his cell phone in the Volkswagen but that Reed returned it with the vehicle.
When Reed returned the Volkswagen, Reed told Defendant something bad happened and that, if the police came looking for him, Defendant should say he did not know Reed. In turn, Defendant repeated what Reed told him when he returned the car to his friend and advised her to deny knowing Reed if the police asked.
Not long after Defendant spoke to Johnson, Defendant's stepfather and step-grandfather were murdered. Defendant blamed their deaths on the fact someone knew he had spoken to the police and that the murders were committed as retribution.
ERRORS PATENT
A review for errors patent on the face of the record reveals none.
DISCUSSION
Pro Se Assignment of Error Number 1
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. When the entirety of the evidence both admissible and inadmissible is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must review the assignments of error to determine whether the accused is entitled to a new trial. State v. Hearold, 603 So.2d 731, 734 (La. 1992). Thus, although insufficiency of evidence is not the first trial error argued by Defendant, it must be the first considered. State v. Contreras , 17-0735, p. 6 (La.App. 4 Cir. 5/30/18), 247 So.3d 858, 865-66.
When reviewing the sufficiency of the evidence to support a conviction, we apply the standard enunciated in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proven beyond a reasonable doubt. State v. Tate , 01-1658, p. 4 (La. 5/20/03), 851 So.2d 921, 928.
The principal criteria of a Jackson v. Virginia review is rationality. State v. Mussall , 523 So.2d 1305, 1310 (La. 1988). In reviewing the evidence, the whole record must be considered because a rational trier of fact would consider all the evidence, and the actual trier of fact is *386 presumed to have acted rationally until it appears otherwise. Id. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. Id. ; State v. Egana , 97-0318, p. 6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 228. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Scott , 12-1603, p. 11 (La.App. 4 Cir. 12/23/13), 131 So.3d 501, 508. Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the trier of fact. Id. "Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. Such a determination rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness." Id. "Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion." State v. De Gruy , 16-0891, p. 11 (La.App. 4 Cir. 4/5/17), 215 So.3d 723, 730, writ denied , 17-0752 (La. 1/9/18), 231 So.3d 652.
In this case, Defendant argues the evidence is insufficient to support his convictions because he cannot be held accountable for the crimes for which he did not have specific intent. He points out that the evidence demonstrated that Holmes shot and killed Meyers while Reed fired the shot that wounded Dorsey. As further proof he did not attempt to kill or inflict great bodily harm on anyone or intend that anyone should be killed, Defendant notes that no evidence exists that he fired a single shot, and that he was running away from the scene by the time the shooting began. Consequently, he claims his convictions for second-degree murder and attempted manslaughter cannot stand.
Under La. R.S. 14:30.1, second degree murder is defined as the killing of a human being when the offender: 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including but not limited to aggravated burglary, armed robbery[4] , first degree robbery, second degree robbery, and simple robbery, even though he has no intent to kill or to inflict great bodily harm. Under the second theory of second degree murder, the State had to prove that defendant was engaged in the perpetration or attempted perpetration of an armed robbery, even if he had no intent to kill or to inflict great bodily harm.
"All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La. R.S. 14:24.
In felony murder, the mens rea of the underlying felony provides the malice necessary to transform an unintended homicide into a murder. Moreover, under general principles of accessorial liability, all parties to a crime are guilty for deviations from the common plan that are foreseeable consequences of carrying out the plan. Thus, when a murder occurs during the perpetration or attempted perpetration of an enumerated felony (such as armed robbery), one need not possess specific intent to kill or inflict great bodily harm, nor be the person who physically killed the victim, in order to be *387 a principal to second degree murder. See State v. Smith , 07-2028, pp. 8-9 (La. 10/20/09), 23 So.3d 291, 296-97.
Jurisprudence indicates that "[a] person may be convicted of an offense even if he has not personally fired the fatal shot..." State v. Hawkins , 16-0458, p. 19 n.13 (La.App. 4 Cir. 5/17/17), 219 So.3d 1133, 1144 n. 13, writs denied, 17-1183,17-1280 (La. 5/18/18), 242 So.3d 575, citing State v. Hampton, 98-0331 (La. 4/23/99), 750 So.2d 867, 880. The law of principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable. State v. Schwander, 345 So.2d 1173, 1174-75 (La. 1977).
La. R.S. 14:31A(2)(a) provides that manslaughter is a homicide committed, without any intent to cause death or great bodily harm, when the offender is engaged in the perpetration or attempted perpetration of any felony, in this case, armed robbery, not enumerated in La. R.S. 30 or La. R.S. 30.1.
Although La. R.S. 14:31A(2)(a) does not specifically set forth a causal requirement between the underlying or predicate felony and the death, such an essential element must be read into the statute. The Supreme Court has held that, when prosecuting a felony-manslaughter, the prosecution is still required to prove that the "defendant's conduct was a legal cause of the killing." See State v. Kalathakis, 563 So.2d 228, 231-33 (La. 1990). The Court has also found that a "causal relation between Defendant's conduct and the harm for which the prosecutor seeks to impose criminal sanctions is an essential element of every crime." Id; see also State v. Kenny, 11-1819, pp. 8-9 (La.App. 4 Cir. 5/29/13), 116 So.3d 992, 997. Notwithstanding that the underlying felony and unlawful killing must somehow be related, the prosecution must prove Defendant and his co-perpetrator were engaged in the perpetration of a felony not enumerated in La. R.S. 14:30 or 14:30.1and that the victim was killed in furtherance of the commission of this felony. State v. Brown , 15-0855, p. 4 (La.App. 4 Cir. 10/21/15), 176 So.3d 761, 765, writ denied, 15-2250 (La. 2/5/16), 186 So.3d 1167.
In turn, La. Rev. Stat. 14:27 defines attempt as:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt[.]
The evidence in this case, when viewed in light most favorable to the State, established Defendant's guilt beyond a reasonable doubt. Defendant's co-defendant, Reed, testified that Defendant planned the armed robbery, supplied Reed with a weapon, and enlisted his and Holmes' assistance in carrying out the crime. Moreover, Reed testified Defendant also devised the plan to remove the victims from the residence and transport them in Dorsey's truck to a secluded area where Defendant planned to kill them.
The jury considered all of the evidence and credited the testimony of the State's witnesses. Defendant's claim of lack of specific intent notwithstanding, the evidence was sufficient to allow a rational juror to find beyond a reasonable doubt that Defendant was guilty of second degree murder and attempted manslaughter. This assignment has no merit.
*388 Counsel Assignment of Error Number 1
Pro Se Assignment of Error Number 2
In these assignments, Defendant complains the trial court erred by refusing to grant a recess of trial to allow the Department of Corrections ("DOC") to transport two defense witnesses to court to testify on his behalf.
The defense sought the presence of Holmes[5] and Reed, both of whom were incarcerated outside of New Orleans. Pursuant to a defense request, the district court signed an order on Monday evening (the second day of trial) ordering the DOC to procure their presence when the trial resumed the following morning. However, they were not present Tuesday morning because the DOC had not received the district court's order in time to ensure timely transport. The defense did not inform the court that Holmes and Reed had not been transported as requested until Wednesday and sought to recess trial based on the non-production of the two witnesses.
While the jury was out of the courtroom, the prosecutor and defense counsel argued the request for recess, after which the court denied the defense request, observing:
We're dealing with a recess of the trial. I denied your continuance based on the fact that your client and the age of this case [pending for three years] and the location of your client, and this Court is always ready to accommodate defense lawyers trying to see their clients because I realize with the locale and the movement of all the inmates, it does become difficult. So then I assisted you on Monday to try to get two incarcerated people here. Now we're finding that you decided on Saturday after your client made the decision for you, and you agreed that Will Reed would provide hearsay testimony. I'm going to find that your request for these witnesses and their appearance in this recess request and the information that I've learned that the facts which you've outlined do not show due diligence used in an effort to procure the attendance of these witnesses, and that one of them in fact would not provide any information except hearsay testimony, and that in this Court's discretion there's no good cause for a recess. Everybody said this trial would last four days. This Court - it's not like I've been unavailable to you to bring people in, and you didn't inform me on Tuesday that your witnesses were not here... I would have gotten them here for this morning...
I sat on this bench all day, and you didn't inform me one-time yesterday that your witnesses were not here or I would have had them brought here. You've seen this Court on many days pick up the phone, call people and make things happen, so don't tell me that I'm not a resource for you and you didn't reach out to me.... Your recess is denied.
La. C.Cr.P. art. 708 provides:
A continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced. A recess is a temporary adjournment of a trial or hearing that *389 occurs after a trial or hearing has commenced.
A motion for a recess is evaluated by the same standards as a motion for a continuance. State v. Plaisance , 00-1858, p. 29 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1193. La. C.Cr.P. art. 709 states:
A motion for a continuance based upon the absence of a witness must state:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
In the present case, the district court did its utmost to secure the presence of Defendant's witnesses. Moreover, defense counsel admitted that he had not interviewed either Holmes or Reed during the three years the case had been pending, and did not know if either man would testify to information that was both admissible and favorable to Defendant. Consequently, the district court denied the defense request for recess because of failure to establish that the absent witnesses were expected to testify to material facts, rendering their presence at trial necessary, and that due diligence was not exercised in an effort to procure their attendance. Defendant failed to demonstrate a sufficient showing under La. C.Cr.P. art. 709 to justify the granting of a recess to secure the witnesses. The trial court did not abuse its discretion when it denied Defendant's request.
This assignment has no merit.
Counsel Assignment of Error Number 2
In this assignment, Defendant complains the trial court abused its discretion by refusing to grant a mistrial after the prosecutor questioned Defendant about a murder for which he was not on trial.
"Mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by Defendant." State v. Lincoln , 17-0170, p. 15 (La.App. 4 Cir. 11/3/17), 231 So.3d 161, 170-71 (citing State v. Leonard , 05-1382, p. 11 (La. 6/16/06), 932 So.2d 660, 667 ). Further, "[t]he mere possibility of prejudice is insufficient to warrant a mistrial." Id. "[E]xcept for instances in which the mandatory mistrial provisions of La. C.Cr.P. art. 770 are applicable, [the remedy] should only be used when substantial prejudice to Defendant is shown." Id. , 17-0170, pp. 15-16, 231 So.3d at 171 (quoting State v. Castleberry , 98-1388, p. 22 (La. 4/13/99), 758 So.2d 749, 768 ).
Pursuant to La. C.Cr.P. art. 770(2), a mistrial shall be ordered upon motion of a defendant "when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to: ... [a]nother crime committed or alleged to have been committed by defendant as to which evidence is not admissible[.]" "An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If a defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial." La. C.Cr.P. art. 770 ; Lincoln , 17-0170, p. 16, 231 So.3d at 171.
During cross-examination, the prosecutor asked Defendant:
Q. The reality is that you have no idea whatsoever what it is like to be accused of *390 something you didn't do because everything you just told that jury was a flat lie; isn't that right?
A. No, sir.
* * *
Q. Mr. Fuller talked about the death of your father and your grandfather, stepfather and step grandfather on January 1, 2015.
A. Yes, sir.
Q. And the reality is that they died because of the chain of violence that you set off in March of 2014?
A. No, sir.
Q. Okay. Let's talk about all the death that has followed this case on both sides, all right. You know who "P" is?
A. Yes, sir.
Q. Wade Reed testified that that's who ended up with all the weight with the cocaine; is that true?
A. I don't know, sir.
Q. Okay. Where is "P" now?
A. I guess dead.
Q. Murdered, right?
A. Yes, sir.
Q. Gerard Dorsey, Christopher Dorsey's father, who y'all contacted inside that house, where is he now?
A. I guess dead.
Q. Dead, right, another murdered person, right? In addition to that Michael Meyers, the brother of Charles Meyers, murdered in December of 2014, isn't that right?
A. Yes, sir.
Q. ... So all of these bodies surrounding you, "P", Gerard Dorsey -
At this juncture, defense counsel objected with a discussion held in chambers. Defense counsel moved for a mistrial because the district court had issued an order prior to trial that the State not mention the murder of Michael Meyers.
After hearing argument from both sides, the district court denied a mistrial, stating:
I've heard what the lawyers had to say. I specifically told the State not to discuss the Michael Meyers case or murder and not to imply that it was a murder that he was charged with. I don't find that the question was an implication that this defendant committed that murder, but I think it's really on the line or over it because your question said followed this case on both sides, about the death that followed this case on both sides. I think neither of you should be talking about Michael Meyers or saying brother to the other person.[6] But I find that in context with the questions that defendant said basically after speaking with the police, his [step]father and [step grandfather] were killed because he was considered to be a snitch, I think that this is harmless based on the fact that he was placing blame on others for the deaths of his family, and the State could show that it may not be just him that's suffering from being accused of something that everyone is (suffering from). I think that the State had the right to bring that up after the questions that were posed to defendant, so the motion for mistrial is denied ...
Examination of the record shows that the State did not directly accuse Defendant of involvement in the numerous homicides in the wake of the crimes charged in this case. Under the circumstances detailed in the reasons for denying Defendant's mistrial request, the district court did not abuse its discretion.
This assignment has no merit.
*391 Pro Se Assignment of Error Number 3
In his final pro se assignment, Defendant complains he received ineffective assistance of counsel.
Generally, ineffective-assistance-of-counsel claims are more properly raised in an application for post-conviction relief, where the district court can conduct a full evidentiary hearing on the matter if warranted. State v. Leger, 05-0011, p. 44 (La. 7/10/06), 936 So.2d 108, 142. However, no law or jurisprudential rule prohibits a defendant from raising the issue of ineffective assistance of counsel on appeal, nor is there a mandate for reviewing courts to only consider this issue during post-conviction relief. We find that the interests of justice and judicial economy are best served by considering Defendant's ineffective assistance of counsel claim at this time. State v. King , 17-0126, p. 17 (La.App. 4 Cir. 10/27/17), 231 So.3d 110, 121.
In Strickland v. Washington , the U.S. Supreme Court established a two-pronged test to attain relief in an ineffective assistance of counsel claim as follows: 1) Defendant must show that counsel's performance was deficient; and 2) that this deficiency prejudiced the defense. 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). As to the first prong, "judicial scrutiny of counsel's performance must be highly deferential." Id. at 689, 104 S.Ct. at 2065. "The object of an ineffectiveness claim is not to grade counsel's performance." Id. at 697, 104 S.Ct. at 2069. Thus, when reviewing a claim of ineffective assistance of counsel, an appellate court "does not sit to second-guess strategic and tactical choices made by trial counsel." State v. Myles , 389 So.2d 12, 31 (La. 1980).
In determining if counsel's deficiency prejudiced a defendant, he must show that more than counsel's errors had some conceivable impact on the outcome of the proceeding. Strickland , 466 U.S. at 693, 104 S.Ct. at 2067. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068.
Defendant argues he received ineffective assistance because his counsel failed to file a timely Motion to Quash the indictment. He reasons that his trial counsel knew or should have known that the 2014 indictment charging him with second degree murder, attempted second degree murder, and armed robbery was fatally defective because it was reinstituted in 2017 after being nolle prossed, and was not resubmitted to a grand jury.
The district attorney's discretionary prosecutorial authority is vast. Louisiana jurisprudence has recognized that the State has the authority to enter a nolle prosequi and reinstitute the charges. State v. Batiste , 05-1571, pp. 5-6 (La. 10/17/06), 939 So.2d 1245, 1249 ; State v. Brown, 11-0947, p. 4 (La.App. 4 Cir. 3/7/12), 88 So.3d 662, 665. Moreover, La. C.Cr.P. art. 691 confers on the district attorney the power to dismiss a formal charge, in whole or in part, without leave of court. La. C.Cr.P. art. 693 provides, subject to narrowly delineated exceptions, that dismissal of a prosecution "is not a bar to a subsequent prosecution." La. C.Cr.P. art. 576 provides:
When a criminal prosecution is timely instituted in a court of proper jurisdiction and the prosecution is dismissed by the district attorney with Defendant's consent, or before the first witness is sworn at the trial on the merits, or the indictment is dismissed by a court for any error, defect, irregularity, or deficiency, a new prosecution for the same offense or for a lesser offense based on *392 the same facts may be instituted within the time established by this Chapter or within six months from the date of dismissal, whichever is longer.
A new prosecution shall not be instituted under this article following a dismissal of the prosecution by the district attorney unless the state shows that the dismissal was not for the purpose of avoiding the time limitation for commencement of trial established by Article 578.
A motion to quash is the proper procedural mechanism to challenge the state's nolle prosequi and reinstitution of charges. State v. Hayes, 10-1538, p. 4 (La.App. 4 Cir. 9/1/11), 75 So.3d 8, 12 ; see also La. C.Cr.P. art. 531.
A trial court's ruling on a motion to quash is a discretionary one, which should not be disturbed absent a clear abuse of discretion. State v. Love, 00-3347, pp. 9-10 (La. 5/23/03), 847 So.2d 1198, 1206 ; State v. Sorden, 09-1416, p. 3 (La.App. 4 Cir. 8/4/10), 45 So.3d 181, 183. The trial court's resolution of motions to quash where the district attorney entered a nolle prosequi and later reinstituted charges must be decided on a case-by-case basis. Batiste , 05-1571, pp. 5-6, 939 So.2d at 1249citing Love, 00-3347, p. 14, 847 So.2d at 1209.
Here, Defendant was charged with second degree murder, attempted second degree murder, and armed robbery, exposing him to sentences imposed with hard labor. La. C.Cr.P. art. 572A(1), provides for prosecution to be instituted within six years of the offenses. The record indicates that the offenses occurred on March 26, 2014; consequently, the State had until March 26, 2020, to institute prosecution. The state reinstituted the charges against Defendant on June 25, 2015, well within the six-year statutory period.
Under La. C.Cr.P. art. 576, the State must also show that the dismissal of the original prosecution was not for the purpose of avoiding the time limitations set by La. C.Cr.P. art. 578. La. C.Cr.P. art. 578A(2) requires that trial of a non-capital felony be commenced within two years from the date of institution of the prosecution. Because second degree murder, attempted second degree murder, and armed robbery are non-capital felonies, the State had to bring Defendant to trial within two years from the date of the bill of indictment. The original indictment was filed on August 21, 2014. The State entered nolle prosequi on October 13, 2015. The charges were reinstituted on June 25, 2015, and trial commenced on April 24, 2017. No evidence exists that the State dismissed the first case in order to avoid the time limitations of La. C.Cr.P. art. 578. Thus, the State timely reinstituted prosecution of the second degree murder, attempted second degree murder, and armed robbery charges against Defendant in this case.
Defendant has not demonstrated that he was prejudiced by the loss or compromise of any witness or evidence due to the ten-month delay between the filing of the original indictment and the reinstitution of charges. The reinstitution of charges against Defendant were statutorily timely. Defendant has failed to prove he received ineffective assistance through defense counsel's failure to file a Motion to Quash. This assignment is meritless.
CONCLUSION
Based on the foregoing, Defendant's convictions are hereby affirmed.
AFFIRMED.
ATKINS, J., CONCURS IN THE RESULT.

Reed pled guilty to the attempted second degree murder of Christopher Dorsey, the manslaughter of Charles Meyers and the armed robbery of Dorsey and Meyers. Reed received a twenty-year sentence without benefit of parole, probation, or suspension of sentence. Co-defendant Holmes pled guilty to manslaughter, armed robbery, and attempted murder, in addition to admitting he was the gunman in the Charles Meyers shooting. Holmes was sentenced to forty years without benefit of parole, probation, or suspension of sentence.

Johnson explained that, following the incidents of this case, several of Dorsey's family members were murdered, causing Dorsey to leave Louisiana and refusing to return to testify.

The State called Thomas Koch, the custodian of Sprint Mobile records, to verify the records of calls made from Defendant's cell phone at the time of the armed robbery and murder.

Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64.

During the testimony of Detective Johnson, the jury learned that Holmes was accused of shooting Meyers and that Holmes originally told the police "Justin" shot Meyers. Subsequently, police discovered that Justin Daniels, who was a Holmes' associate, was the "Justin," Holmes said shot Meyers. However, police investigation confirmed that Justin Daniels was incarcerated at the time Meyers' murder. Subsequently, Holmes pled guilty to reduced charges prior to this trial and received a forty-year sentence.

On appeal, the State noted that the defense, in its cross-examination of Johnson, first raised the fact that Michael Meyers was killed in December of 2014.