801 So.2d 1196 (2001)
STATE of Louisiana
v.
Wellington C. BAKER.
No. 2000-KA-2520.
Court of Appeal of Louisiana, Fourth Circuit.
November 21, 2001.
*1197 Harry F. Connick, District Attorney, Scott Peebles, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
Karen G. Arena, Louisiana Appellate Project, River Ridge, LA, Counsel for Defendant/Appellant.
*1198 Court composed of Judge STEVEN R. PLOTKIN, Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR.
MICHAEL E. KIRBY, Judge.

STATEMENT OF CASE:
Wellington C. Baker was indicted on February 6, 1997, for the first-degree murders of Anthony Moten and Perry Smith, a violation of La. R.S. 14:30, to which he pled not guilty on February 18, 1997. On October 29, 1999, a twelve-member jury convicted him of two counts of second-degree murder. The court sentenced the defendant on February 29, 2000, to life imprisonment without benefit of probation, parole or suspension of sentence, but with credit for time served.

STATEMENT OF THE FACTS:
On November 12, 1995, at 11:55 p.m., George Moten gave a statement to New Orleans Police Officer Michael Mims at police headquarters regarding the shooting deaths of Anthony Moten and Perry Smith. Moten stated that on the evening of the 12th he was exiting the Fisher Housing Project, to go to a grocery store located at the intersection of Whitney and Newton, when he saw the defendant Wellington Baker, whom he knew as Willie Dirt. Shortly before George Moten departed, Anthony Moten and Perry Smith left George Moten to go to a video store. When Moten returned from the store, he stated that he saw Baker leaning against a building with an AK-47 assault rifle at his side. Moten then asked Baker what he was doing, and he replied, "I'm going to kill all these mother f___ers." Moten stated he then told Baker to put the gun away, but Baker was insistent that he was going to "show them." Moten then asked Baker to let him leave, and Baker replied, "I respect you George. You're all right." Moten then walked away. Moten stated he did not enter the apartment he was returning to, but remained outside looking at Baker. Moten said he then heard Baker say, "I'm Willie Dirt" to which Perry Smith, replied, "what's wrong with you Willie?" Moten stated he heard the rifle, and saw Baker aiming the gun at Smith. Moten screamed, "that's my family man," and then Baker began shooting at Smith and Anthony Moten. According to George Moten, Smith and Anthony Moten began running around a staircase trying to get away from Baker who continued to shoot at them. George Moten said Smith fell down, and Baker stood over him shooting him as he lay on the ground. Moten stated Anthony Moten was behind the staircase, so he was unable to see Anthony being shot. Moten said Baker then ran off still holding the machine gun. After giving his statement to the police Moten then identified Baker in a photographic line-up.
In his motion hearing and trial testimony, Moten's recollection of the events of November 12, 1995, varied from his statement given to Officer Mims. At the motion hearing, Moten testified that when he saw Baker with the gun he asked why was he standing there with it. However, Baker did not reply, instead he stood there "looking crazy." Moten then testified he told Baker to put the gun away because the police would kill him on the spot if they saw him. At trial, Moten testified that when he approached Baker, he asked him "what's up? Did you and your family get into it?" Baker then replied, "something like that." Moten testified Baker then stepped away from the pipe he was leaning on, and that was when he saw the AK-47. Moten said he then told Baker, "If the police see you they are going to kill you," and Baker replied by asking "where they at?" Moten said he then left Baker standing there. Moten testified he returned to his girlfriend's apartment, but only momentarily because he realized that Smith *1199 and Anthony had to walk past Baker on their return from the video store. The remainder of Moten's testimony is consistent, but he did not testify at trial that he saw Baker stand over Smith and shoot him as he lay on the ground.
Dr. William Newman performed the autopsies on the bodies of the victims. The cause of death for Anthony Moten was probably a gunshot wound to the neck that severed his left carotid artery. The cause of death for Perry Smith was a gunshot wound to the head. The shooter delivered the fatal wounds while standing a distance of two or three feet from the victims. Test results on the various bodily fluids were negative for commonly abused drugs and alcohol in Anthony Moten, but were positive for cocaine in Perry Smith.
Officer Al Miller of the New Orleans Police Department testified he and his partner were the first on the scene. When they arrived they found a crowd standing around the bodies of two unidentified black males. Officer Miller and his partner secured the crime scene and began to look for evidence, as well as look for witnesses, obtain identification of the victims, notify the crime lab, and the detective bureau.
Peter Cuadrado, an officer with the New Orleans Police Department's Crime Lab Unit, was dispatched to the scene on the night of November 12th. When he arrived, he found the bodies and shell casings. He marked the evidence with yellow markers, and took photographs of the scene. He collected one Winchester nine millimeter spent casing, fifteen 7.62 by 39 millimeter rifle casings, and one spent bullet.
Timothy Seuzeneau, a retired New Orleans Police Officer who had been assigned to the Crime Lab Unit on the night of the murders, testified that he examined the shell casings from the crime scene. Seuzeneau used a forensic light unit in his examination of the casings in the hopes of finding latent fingerprints; however, he was unable to find any.
Byron Winbush, of the New Orleans Police Department Crime Lab Unit, was stipulated to be an expert in the field of firearms identification. Officer Winbush testified that all of the 7.62 by 39 millimeter casings were fired from the same AK-47 assault rifle.
Detective Ira Lee Todd, of the Detroit Police Department's Violent Crime Task Force, testified that on January 4, 1997 he and other members of the task force arrested the defendant, Wellington Baker. Baker was working at a local grocery store under an assumed name. After arresting Baker, Todd testified that he was taken to police headquarters where he gave a statement after being given his rights. Todd stated Baker had the opportunity to review the statement and make any corrections or changes he thought necessary.
Sherwood Crump, a U.S. Marshal and a member of the Violent Crime Task Force, was also involved in the arrest of Wellington Baker. Marshal Crump corroborated the testimony of Detective Todd. He testified that before Baker gave his statement he was booked, photographed, and fingerprinted; that, Baker was given his rights before he made his statement; and that, Baker had the opportunity to review the statement to make any changes or corrections to the statement he thought necessary.
Asalee Baker, Wellington Baker's mother, testified that on the night of November 12th she and her other children along with her nephew Raymond Minor, sat around her apartment talking and laughing. She stated she got a phone call from her son, Wellington, asking if someone could give him a ride because he had just been in a car accident. She then *1200 testified that she asked her nephew to go and get him.
Raymond Minor, Baker's cousin, testified that on the night of November 12, 1995, he transported Baker to the home of Wanda Fleming. Minor stated Baker called and asked for a ride after the car he was driving was damaged in a car accident that same evening. Minor further testified that when he arrived at the scene of the car accident the car Baker had been driving was being connected to a tow truck. He then dropped Baker off at Wanda Fleming's home and left him there.
Wanda Fleming, a friend of Baker, testified that she could not recall what time she had gone to bed that night, but when she turned over she realized Baker was in bed with her. Upon realizing Baker had joined her in bed, Fleming stated, they had intercourse, and she went back to sleep. She testified when she woke the next morning Baker was still in her bed, and that he remained at her home for most of the day.
Wellington Baker corroborated the testimony of the defense witnesses by testifying that he was in a car accident and that Minor gave him a ride to Fleming's home where he stayed until late the following evening. Baker testified that he learned he was wanted for the murders of Smith and Moten as he watched the news, and that he left Fleming's home that night, and a few hours later purchased a bus ticket to Detroit where he remained until his arrest.

ERRORS PATENT
A review of the record reveals no errors patent.

DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, defendant complains that the trial court erred in denying his motion for mistrial based on the State's failure to produce the statement of a key witness until after the jury had been voir-dired and selected.
The defendant specifically complains about George Moten's statement made at the motion hearing, which depicted the defendant as not in his right mind. He complains that since this differed greatly from the statement made right after the incident, which depicted the defendant as a cold calculated killer, the defense was ill-prepared to go forward with trial. The defendant asserts he was deprived of the opportunity to have independent experts examine the likelihood that shots were fired into the victims as they lay on the ground, and to find other witnesses to challenge George Moten's credibility. Therefore, the defendant's constitutional right to a fair trial was compromised when the State failed to turn over a statement requested at least two years prior to the trial.
The U.S. Supreme Court in Brady v. Maryland, 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), has stated that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. Evidence is material, and discoverable, if there is a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Bagley, supra. Evidence the government has failed to disclose to the defendant is considered collectively, not item-by-item, when determining whether the materiality requirement of Brady has been satisfied. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 *1201 (1995). Under the standard stated in Bagley, the reviewing court may consider directly any adverse effect that the prosecution's failure to respond might have had on the preparation or presentation of the defendant's case. Bagley, 105 S.Ct. 3375 at 3381-3385.
Here, in contrast to Kyles, the State provided the information prior to trial. When the State called George Moten as a witness at trial the Court recessed for the day to give defense counsel an opportunity to analyze and, in his words "digest," the statement instead of working late as it had originally planned. Once given the statement the defendant used it in cross examination to point out the inconsistencies in his testimony. The inconsistencies may have cast doubt on Moten's credibility, which could account for the conviction of lesser offenses. Additionally, it should be noted that the trial judge excluded from evidence certain photographs that he believed could have corroborated the facts recited in late-disclosed statement. While it may have been more convenient for the defendant to have George Moten's statement sooner, the failure of the State to turn it over earlier does not create a reasonable probability sufficient to undermine the confidence in the outcome. This is especially true since the court took pains to give defense counsel an opportunity to prepare a cross-examination and defense counsel used the statement to impeach George Moten.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER 2
In his second assignment of error, defendant complains the trial court erred in denying his motion for a new trial. The motion was based mainly on the grounds of newly discovered evidence.
La.C.Cr.P. art. 851, in pertinent part, provides:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
. . . .
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
. . . .
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
In order to obtain a new trial based on newly discovered evidence, the defendant must show: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not due to the defendant's lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have changed the verdict of guilty. State v. Bright, 98-0398, pp. 25-6 (La.4/11/00), 776 So.2d 1134, 1149. A trial court assessing the legal merits of a motion for new trial is given considerable latitude in evaluating the reliability of the evidence and its impact on the verdict. State v. Brooks, 98-0693 (La.App. 4 Cir. 7/21/99), 758 So.2d *1202 814, writ denied, 99-2519 (La.2/25/00), 755 So.2d 247. The trial court has much discretion in ruling on a motion for new trial. State v. Cureaux, 98-0097, (La.App. 4 Cir. 5/26/99), 736 So.2d 318, 321. Review of the trial court's ruling is limited to determining whether the trial court abused its discretion. State v. Labran, 97-2614 (La.App. 4 Cir. 5/26/99), 737 So.2d 903, 907, writ denied, 99-1981 (La.1/7/00), 752 So.2d 175.
The motion for new trial alleged: (1) newly discovered evidence; (2) the new evidence would have changed the outcome of the trial; and (3) the court's refusal to grant a mistrial was prejudicial error. The standard for determining prejudicial error has already been discussed in the first assignment of error. The remaining claim, newly discovered evidence, has to meet the four-prong test established by the Louisiana Supreme Court in Bright, supra.
In support of his motion for new trial the defendant offered the testimony of his mother, Asalee Baker, to the effect that George Moten's girlfriend had told her, after the defendant was convicted, that Moten did not exit his girlfriend's apartment until after the shooting had occurred. Presumably that would have meant he could not have been an eyewitness to the event as he had testified. However, Ms. Martin, the girlfriend, testified at the Motion for New Trial hearing and she categorically denied telling Ms. Baker that George Moten was inside her apartment at the time the shooting was going on. She testified she was in the bath tub when she heard shots and jumped out of her tub, donned her bathrobe and crawled to the door where she saw Moten shouting at the gunman from outside her apartment. As she went out of the door she saw the defendant with the gun in his hand.
Another basis proffered for a new trial was the testimony of Ms. Alveris Ruffin. Ms. Ruffin contacted the Orleans Parish District Attorney's office on October 29, 1999, the same day the jury convicted defendant. She was interviewed by representatives of the District Attorney's office on November 2, 1999. Her statement was introduced into evidence at the hearing on the motion for new trial. In it Ms. Ruffin stated that she did not come forward earlier because she lived near the defendant's family and feared for her safety.
She recounts the events of the murder for the investigators by saying that she observed the two victims and the defendant have some sort of a confrontation as the two victims left the complex, apparently when they left to go rent movies. They returned about 20 to 25 minutes later whereupon Ms. Ruffin stated "I kept hearing him [defendant] just fussing, and fussing and fussing .... then I heard ... says [sic] you better go ... You better ... I'm giving you three m____ f______ you better go. One, two, three and all of a sudden I say, [sic] him boom boom boom boom boom boom." Ms. Ruffin further stated that after she called 911 she ran to the "front" and "he was in the ... he was hollering `who the f_______ man is now. I'm the f______ man. I'm the f______ man.' Then he went up on the second floor.... And he left and went toward Whitney and General DeGaulle."
The defendant contended in argument to the court that Ms. Ruffin's account of the crime is different from Mr. Moten's account and this evidence would have further impeached Mr. Moten on cross-examination. In his written motion for new trial he suggested Ms. Ruffin's account could form the basis of an argument in support of a claim of self defense.
The trial court found the evidence of the defendant's guilt "overwhelming." It *1203 acknowledged there were a number of inconsistencies between the testimony of various witnesses and it noted defense counsel did a very extensive job of highlighting all the inconsistencies. However, it agreed with the jury that the evidence of the defendant's guilt was overwhelming. It concluded by saying that it was satisfied the defendant had been afforded a fair trial. Insofar as Ms. Ruffin's statement, who concluded that "its' [sic] just another witness who basically puts the hat on the defendant, Mr. Baker."
After a careful review of the record, we agree with the trial court that the defendant received a fair trial. The defendant failed to carry his threshold burden of showing under La.C.Cr.P. art. 851 that he suffered an injustice or that the result would have been different had the evidence been available for the jury at trial. We do not find the trial court abused its discretion.
This assignment of error is without merit.

CONCLUSION:
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.