Judge Regina Bartholomew-Woods
Defendant, Tyrone Warner[1] (hereinafter referred to as "Defendant"), appeals the jury's verdict finding him guilty of aggravated rape[2] and aggravated kidnapping and the district court's March 15, 2018 judgment sentencing him to life imprisonment, without benefit of parole, probation, or suspension of sentence on both counts. Defendant also appeals the district court's judgment assessing prosecution costs and court costs against him in the amount of $ 57,387.00. For the reasons that follow, we affirm, in part, and reverse, in part.
STATEMENT OF THE CASE
On October 27, 2011, Defendant was indicted on one count of aggravated kidnapping, in violation of La. R.S. 14:44[3] and *76 one count of aggravated rape, in violation of La. R.S. 14:42[4] for the kidnapping and rape of the victim, V.P. (hereinafter referred to as "V.P."),[5] that occurred on January 31, 1990. Defendant entered a plea of not guilty. On June 12, 2014, Defendant appeared for a Quatrevingt hearing to challenge the admissibility of the DNA evidence[6] , which the district court denied and allowed the introduction of the DNA evidence by the State of Louisiana ("the State"). Thereafter, the State noticed its intent to introduce evidence under La. C.E. art. 412.2,[7] which the district court granted. In response, Defendant filed a writ application for supervisory review of the district court's ruling. Both this Court and the Louisiana Supreme Court denied Defendant's writ applications. State v. Warner , 2016-0339, p. 1 (La. App. 4 Cir. 5/18/16), writ denied , 2016-1154 (La. 10/10/16), 207 So. 3d 404.
The jury trial commenced on December 4, 2017, and on December 6, 2017, the jury returned a ten-to-two verdict finding Defendant guilty on both counts of aggravated kidnapping and aggravated rape. On January 26, 2018, the district court denied *77 Defendant's motion for a new trial. On March 15, 2018, the district court sentenced Defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence on both counts with credit for time served. The district court also assessed prosecution costs and court costs against Defendant in the amount of $ 57,387.00. Defendant now files this appeal and asserts five (5) assignments of error.
STATEMENT OF FACTS
On January 31, 1990, V.P. was walking home with her infant son on Annunciation Street near the St. Thomas Housing Development in New Orleans, when she was approached by a black male suspect in a vehicle. The suspect brandished a gun and ordered V.P. and her son into the vehicle. The suspect then drove V.P. and her son to the nearby park and forced her to perform oral sex on him. Subsequently, the suspect vaginally raped V.P. After the incident, V.P. underwent a rape examination. The male's DNA produced from the examination was then uploaded to the Combined DNA Index System ("CODIS").
Officer Derrick Williams
At Defendant's trial, the State called Officer Derrick Williams ("Officer Williams"), of the New Orleans Police Department ("NOPD") Sex Crimes Unit, as its first witness to testify to the "other crimes" evidence.[8] On direct examination, Officer Williams testified that there was a call of attempted aggravated rape, during the early morning hours of November 2010, at the intersection of Broad Street and Washington Avenue. He explained that he was not the responding officer; however, he had an opportunity to interview the victim at NOPD's office. Based on the information provided during that interview, he was able to obtain an arrest warrant for Defendant, for the charge of attempted forcible rape.
On cross-examination, Officer Williams confirmed that he was made aware of the tenant-landlord relationship between the victim and Defendant. Officer Williams denied knowledge of communications between the parties regarding an invitation for Defendant to come to the victim's apartment for dinner in exchange for rent payment.[9] Officer Williams also confirmed that there was no physical evidence or sexual assault kit available to corroborate the victim's allegations.[10] However, on re-direct examination, Officer Williams recounted that the victim seemed very matter of fact while explaining the incident. Additionally, he testified that the victim stated there was no penile-vaginal penetration, but Defendant's penis did touch her vagina.
Gina Pineda Murphy
The State's next witness was Gina Pineda Murphy ("Ms. Murphy"), a DNA consultant with a specialty in forensic human DNA testing. Ms. Murphy was formerly *78 employed by ReliaGene Technologies ("ReliaGene"), the testing company that received V.P.'s rape kit in May 2005. Ms. Murphy explained that ReliaGene was contracted with the NOPD Crime Laboratory in 2005 to test the backlog of rape kit cases. All of the rape kits that tested positive for seminal fluid were analyzed to obtain DNA profiles. She explained the document handling, standard operating procedure, and testing protocols employed to ensure the integrity of DNA samples and reliability of results. She stated that once the integrity of the samples was determined to be adequate, the samples were assigned a case number and logged into a computer database.[11] She explained that those procedures and protocols were properly followed to ensure that the integrity of DNA samples had not been compromised.
She recalled the rape kit, in the present case, contained two samples: (1) an intimate swab from the victim and (2) a victim-known blood stain card, which were tested by two independent analysts. From these results, a report was generated that included the summary of ReliaGene's findings. The initial report was issued in September of 2005. Ms. Murphy recounted that, while Hurricane Katrina ("Katrina") occurred in August of 2005, the laboratory neither received any water damage, nor were any of the samples housed in that facility damaged or harmed.[12] She also recounted that the testing of the DNA samples in this case were performed prior to Katrina, and only the generation of the data analysis and final report was needed after Katrina.
Ms. Murphy then explained the DNA test results, asserting that a male DNA profile was developed from the testing of the vaginal swab obtained during V.P.'s rape examination.[13] She further explained that, at the time of testing, the donor's identity could not be determined because there were no known samples in CODIS to compare; thus, the profile was uploaded in CODIS to await "a hit." To qualify the integrity of the male DNA profile developed in this matter, Ms. Murphy indicated that the DNA sample tested was neither "contaminated" nor "degraded."[14]
On cross-examination, Ms. Murphy testified as to the chain of custody of the DNA
*79 samples received from V.P.'s rape examination. She indicated that they received the DNA samples from NOPD's Crime Lab, and once it was at the facility, there was an internal chain of custody followed in handling the samples. Defendant indicated that the chain of custody document, introduced as Defense Exhibit 1, did not indicate that the DNA samples were transferred from NOPD's Crime Lab to ReliaGene's facility. To contest this assertion, Ms. Murphy indicated the signature of the agent who transferred the samples was evidenced on the document, even though she admitted the document did not evince the term "transfer" on its face.
On redirect examination, Ms. Murphy indicated that the chain of custody document introduced is a three-page document that contains different rows or lines utilized to document the transfers of the DNA samples. She urged that the documents indicate that the DNA samples were transferred and evinces the time and the agent who completed the transfer.
V.P.
V.P. testified that, on the night of the incident, she was playing cards, with her infant son, at a friend's residence in the St. Thomas Housing Development. At the end of the night, she decided to find the nearest pay phone to call for a ride home because it was very late.[15] As she waited at the pay phone, a vehicle pulled up. The suspect brandished a gun and ordered her to "get in." She testified that, once she got into the vehicle, the suspect attempted to force her to perform oral sex. Her infant son, who had been placed in the backseat, was incessantly crying and trying to get in the front seat with her. However, she testified that the driver continuously knocked him down over the seat. The suspect then drove V.P. and her son to a nearby park, where he ordered her to get out of the vehicle. However, due to her son's crying, he brought her back to the vehicle. Once back inside of the vehicle, the suspect ordered her to perform oral sex on him and then vaginally raped her. After the incident was over, the suspect dropped V.P. and her son off on a corner and ordered them out of the vehicle. It was at this time that V.P. used a phone to call her mother to inform her of the rape. V.P. testified that her mother picked her up and drove her to the police station. From there, she was transported to a hospital to receive a rape examination where a vaginal swab was taken.[16]
V.P. testified that, at that time, she could not provide an accurate description of her attacker because it was dark outside. However, sometime later, she contacted the police to identify a suspect she believed to be her attacker based on a conversation she had with her former boyfriend.[17] Based on the description of the man provided by her former boyfriend, she identified her attacker as August Quinn ("Mr. Quinn").[18] Subsequently, V.P. decided not to move forward with prosecuting because she was unsure of the identification. [19]
*80 After the dismissal of the case against Mr. Quinn, V.P.'s case became a cold case.
V.P. testified that a few years ago, she was contacted by a Detective, who notified her that Defendant was her attacker based on DNA evidence obtained from CODIS.[20] She informed the Detective that she neither knew Defendant, nor did she ever have a consensual sexual relationship with him. At trial, she maintained that she did not know him and could not make an identification.[21]
On cross-examination, V.P. recalled that she gave the police the following description of her attacker: a black male with a mustache, about 5'8?-5'9? and approximately 160-180 pounds. She further admitted that she initially identified someone else as her attacker. However, she recounted that she "had a change of heart" in moving forward with the prosecution due to uncertainty surrounding the identification. Again, the defense asked if V.P. knew Defendant, which she vehemently denied.
On re-direct examination, V.P. stated that it was not until her name was revealed in opening statements that Defendant asserted a story that her sister testified on Defendant's behalf in an unrelated criminal matter.[22] V.P. also urged that her purpose for testifying in this matter was to prevent a crime, of this degree, from being committed against another person.
Dr. David Ross
The State called Dr. David Ross ("Dr. Ross") as its next witness. Dr. Ross, an Emergency physician, performed V.P.'s rape examination on the night of January 31, 1990. Dr. Ross explained that he was an emergency medicine resident at Charity Hospital at that time. One of his duties included performing examinations, documenting physical evidence, and collecting evidence of patients who presented as victims of sexual assault; thus, he was the doctor who received V.P. upon her arrival at the hospital and generated her sexual assault evaluation report.[23] He memorialized that V.P. provided a statement that she was "forced at gunpoint in a car and raped vaginally and orally multiple times." Further, he indicated V.P. had not showered or douched prior to the examination.[24]
*81 He also referenced that the document indicated that V.P. was "aloof but cooperative, distant" during the evaluation, which he stated is not an uncommon response of sexual assault victims. He also documented that V.P.'s underwear had been torn and that the examination revealed that V.P. possibly had body fluid on her "right buttocks."[25] Dr. Ross testified that V.P. did not exhibit any signs of intoxication. Moreover, he indicated that sperm was found in V.P.'s vagina, but no evidence of any physical injuries. However, he indicated that the lack of physical injuries is not a dispositive factor that negates a sexual assault occurred. He explained that it is not uncommon that the vagina of a victim does not evince trauma due to the organ's resilience, especially if a victim has given birth. Lastly, V.P.'s clothing, along with the vaginal swabs from the examination, was collected, packaged, and sealed and turned over to NOPD.[26]
Sergeant Francis Jarrott
The State then called Sergeant Francis Jarrott ("Sgt. Jarrott") of NOPD's Cold Case Sex Crime Unit to testify. He explained that he became involved with the instant case upon receipt of the CODIS match notification letter[27] in 2011 indicating a DNA match between a sexual assault investigation and Defendant. After receiving this notification, he applied for a search warrant to obtain a buccal swab from Defendant to confirm the CODIS match with the Louisiana State Police Crime Lab ("the State Police"). In May of 2011, a buccal swab of the inner cheek of Defendant's mouth was obtained and mailed to the State Police for confirmation. In October of 2011, the State Police confirmed that the DNA obtained from Defendant's buccal swab matched the DNA profile from V.P.'s rape kit. Sgt. Jarrott also noted that the State Police provided a crime lab report that provided a statistical analysis of the DNA profile. He provided the report which indicated that the chance of another person with the exact same DNA profile as the one contained in V.P.'s rape kit was 1 in 8.5 billion.[28]
Anne Montgomery
Next, the State called Ms. Anne Montgomery ("Ms. Montgomery"), who was *82 qualified by the district court as an expert in the field molecular biology and DNA analysis. She was employed by the NOPD Crime Lab from 2001 until 2007. She provided that she was hired as a professional contractor by the City of New Orleans and tasked with setting up a DNA lab in NOPD's Crime Lab. She described the process in which DNA profiles are indexed from the local and state levels to the federal combined DNA index system, which is CODIS.[29]
She noted that the federal government had concerns about the volume of sexual assault kits throughout the United States that had not been analyzed or processed due to personnel shortages. Thus, in response, the National Institute of Justice developed a grant program to provide states with funding to reduce the volume of sexual assault backlog kits. Using these federal grant funds, Ms. Montgomery was able to pay private labs to process NOPD's backlogged rape kits. She recounted that this project began in 2003 and NOPD used two labs to process these kits. ReliaGene was the primary lab NOPD utilized.
As it relates to the instant matter, Ms. Montgomery discussed the samples retrieved from V.P., testifying to the procedures employed by the NOPD Crime Lab in verifying the results from the raw data. Ms. Montgomery also provided insight as to the procedures utilized to ensure that the proper protocols were followed by ReliaGene. She recalled that the male DNA profile obtained from V.P.'s vaginal swabs were uploaded in CODIS in 2010.
Further, she documented the general chain of custody of transferring DNA samples from NOPD Crime Lab to ReliaGene, noting that when a sample was relinquished from one lab to another, there was always documentation of who relinquished it and who received it. In this case, V.P.'s vaginal swabs were transferred by NOPD to ReliaGene prior to the occurrence of Hurricane Katrina, and noted that the swabs remained in the custody of ReliaGene until the NOPD Crime Lab was operational following the storm.[30] ReliaGene processed and signed off on this case in September 2005. The information was in the CODIS database from 2006 until 2011 when the DNA profile was matched to Defendant. Moreover, Ms. Montgomery opined, from the statistical data provided in the DNA profile issued by the State Police, that "to a reasonable degree of scientific certainty and to the exclusion of others, barring an identical twin, that [Defendant was] the donor of that profile."[31]
Phillip Simmers
Phillip Simmers ("Mr. Simmers"), a DNA analyst at the Louisiana State Crime Lab, was also called by the State to testify. Mr. Simmers, qualified by the court in *83 DNA analysis, testified that, in 2011, he compared the biological evidence contained on the buccal swab from Defendant to the DNA profile uploaded from the CODIS database. From this comparison, he determined that the profiles were identical and belonged to Defendant. Mr. Simmers opined that the DNA profile, which originated from a mixture of the DNA of V.P. and that of Defendant, was 8.54 billion times more likely to be observed from a mixture of V.P.'s DNA and Defendant's DNA, than if it had originated from the victim and an unrelated, random individual.[32]
Defendant
After the State rested its case, Defendant took the witness stand in his own defense. He testified that he was first made aware of the identity of V.P. in the State's opening statement. Upon this revelation, he immediately informed his defense attorney that he knew V.P. He also testified that he informed his defense counsel that her sister had testified for him in an unrelated case in 1990. He adamantly denied raping V.P. and insisted that he never committed sexual assault on anyone.[33]
On cross-examination, when questioned as to why he did not assert the defense of consent prior to trial, he explained that V.P.'s name was redacted from all reports of the incident and indictment and he had not known her identity until opening statements.[34] He further provided that V.P. lived in his former neighborhood and he had engaged in consensual sex with her at her residence, in return he provided payment for her services. He also stated that the two had engaged in consensual sexual relationships more than once, but did not remember if the pair had engaged in consensual sex the night of the incident at issue. Moreover, Defendant did not affirm that he disputed the integrity of the DNA evidence as being contaminated or compromised; rather, he asserted his omission of guilt for this crime.
DISCUSSION
Errors Patent
A review of the record does not reveal any errors patent.[35]
Assignments of Error
Defendant asserts the following assignments of error:
(1) Whether the evidence presented at trial was insufficient to support the jury's verdict of guilty on any count;
*84 (2) Whether the district court erred in not granting Defendant's motion for new trial;
(3) Whether Defendant's right of effective assistance of counsel, pursuant to Sixth Amendment to the United States Constitution, was violated;
(4) Whether the provision of the Louisiana Constitution allowing non-unanimous jury verdicts violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and is entitled to retroactive application of changes in Louisiana Constitutional Law;
(5) Whether Defendant's right against cruel and unusual punishment and excessive fines, pursuant to the Eighth Amendment to the United States Constitution, was violated by the district court when assessing prosecution costs.
For the reasons that follow, we find that Defendant's fifth assignment of error is meritorious. However, we find the remaining assignments of error lack merit.
Assignments of Error No. 1 and No. 2
In Defendant's first assignment of error, he argues that the evidence presented at trial was insufficient to support the jury's guilty verdict. Consequently, in his second assignment of error, Defendant argues the district court erred in denying his motion for a new trial. For ease of discussion, we address both assignments of error together in this section.
The Louisiana Supreme Court, in State v. Brown , set forth the standard for evaluating a claim of insufficient evidence, stating that:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt."
* * *
...Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. (internal citations omitted).
2003-0897, p.22 (La. 4/12/05), 907 So.2d 1, 18.
"If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted." State v. Hickman , 2015-0817, p. 9 (La. App. 4 Cir. 5/16/16), 194 So.3d 1160, 1166 (quoting State v. Green , 588 So.2d 757, 758 (La. App. 4th Cir. 10/29/1991) ). Further, " '[w]here the key issue is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof.' " State v. Hutsell , 2017-0112, p. 17 (La. App. 4 Cir. 4/18/18), 241 So.3d 542, 552 (quoting State v. Scott , 2015-0778, p. 10 (La. App. 4 Cir. 6/29/16), 197 So.3d 298, 305 ).
Here, Defendant contends that the State failed to establish that he was the perpetrator who raped V.P. To support this assertion, he asserts two arguments. First, Defendant argues that V.P. never identified him as her perpetrator, but instead identified another man. He also argues V.P.'s initial description of her attacker does not match him. Second, he argues that the State did not negate every *85 reasonable hypothesis of innocence, averring that the State did not consider that he had a consensual sexual relationship with V.P.
At trial, the jury heard testimony from V.P. who vividly narrated the events that took place the night of the incident, recounting that Defendant forced her into his vehicle at gunpoint and forced her to perform oral sex before vaginally raping her. She also recalled the fear and degradation she experienced during this incident and the cruel treatment her infant son was subjected to at the hands of Defendant. Dr. Ross also testified that V.P. came to the hospital the night of the incident to receive a rape examination; thus, confirming that the vaginal swabs were taken the night of the incident.
The jury also heard the un-refuted testimony of the State's DNA experts, Ms. Montgomery and Mr. Simmers, who eliminated any uncertainty regarding Defendant's DNA profile that was extracted from the vaginal swabs taken from V.P. In fact, Ms. Montgomery opined that scientific evidence exists as to the reasonable certainty that the DNA extracted was Defendant's DNA. Mr. Simmers corroborated her testimony by stating the report evidenced that the DNA profile, which originated from a mixture of the DNA of V.P. and that of Defendant, was 8.54 billion times more likely to be observed from a mixture of V.P.'s DNA and Defendant's DNA, than if it had originated from V.P. and an unrelated, random individual.
As to Defendant's assertion that V.P. initially identified another man as her attacker, V.P. did not negate this fact; however, she vehemently insisted that she did not move forward with the prosecution because could not affirmatively assert that this man was her attacker. Further, as to V.P.'s initial description of her attacker, she maintained that, despite giving a description to the police, she could not identify her attacker. Notably, however, V.P.'s initial description is similar to that of the Defendant. Comparable to V.P.'s initial description, the record before us reflects that Defendant is a black male, approximately 200 pounds, and 5'11?.[36]
As to Defendant's assertion that he had a consensual sexual relationship with V.P., she adamantly denied knowing Defendant or ever having a consensual sexual relationship with him. She also urged that this incident was rape; that it was not a consensual sexual incident. Thus, viewing all of the evidence in a light most favorable to the prosecution, a rational trier of fact could have found, beyond a reasonable doubt, that the State proved that Defendant was guilty of this crime. The factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Hunter , 2018-0206, p. 4 (La. App. 4 Cir. 8/22/18), 252 So.3d 1053, 1058 (citing State v. Gibson , 2015-1390, p. 5 (La. App. 4 Cir. 7/6/15), 197 So.3d 692, 696. Thus, we find Defendant's first assignment of error lacks merit.
In his second assignment of error, Defendant argues the district court erred in denying his motion for new trial. Defendant's motion for new trial alleged: (1) the insufficiency of the evidence to support the convictions; (2) the discovery of new evidence; (3) the State violated its ethical obligation by not identifying the victim; and (4) error in the denial of the defense motion for continuance urged during trial.
We previously considered and disposed of Defendant's assertion of insufficiency of evidence. We have determined that it lacks *86 merit. Thus, we now consider the other points raised by Defendant's motion for new trial.
La. C.Cr.P. art. 851(A), which sets forth the grounds for a new trial, states, in pertinent part, that:
A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
* * *
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
This Court, in State v. Brown , articulates that, "[i]n order to obtain a new trial based on newly discovered evidence, the defendant must show: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not due to the defendant's lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have changed the verdict of guilty." 2000-2520, p. 8 (La. App. 4 Cir. 11/21/01), 801 So.2d 1196, 1201 (citing State v. Bright , 1998-0398, pp. 25-6 (La. 4/11/00), 776 So.2d 1134, 1149 ). As the fact finder, "[t]he trial court has much discretion in ruling on a motion for new trial." State v. Baker , 2000-2520, p. 9 (La. App. 4 Cir. 11/21/01), 801 So.2d 1196, 1202 (citing State v. Cureaux , 98-0097 (La.App. 4 Cir. 5/26/99), 736 So.2d 318, 321 ). "Review of the trial court's ruling is limited to determining whether the trial court abused its discretion." Id.
Here, as to Defendant's assertion of newly discovered evidence, he must be able to meet the four-prong test provided by this Court in Baker . Baker , 2000-2520, p.8, 801 So.2d at 1202 (citing State v. Bright , 1998-0398, pp. 25-6 (La. 4/11/00), 776 So.2d 1134, 1149 ). In support of the first prong of the test, Defendant provided affidavits from his fiancé[37] and brother[38] , attesting that Defendant and V.P. knew each other, had a consensual sexual relationship, and that V.P. lived near Defendant. However, this "newly discovered evidence" was discovered during trial. According to Defendant's own testimony, he learned of the identity of V.P., during the State's opening statement. The Louisiana Supreme Court established, in State v. Bright , that newly discovered evidence must be discovered after trial. 1998-0398, pp. 25-6 (La. 4/11/00), 776 So.2d 1134, 1149. Thus, the first prong of the test to obtain a new trial based on newly discovered evidence was not met. Moreover, based on the testimony and DNA evidence presented at trial, it cannot be said that Defendant's alleged additional witnesses *87 would have produced a different verdict. The jury heard Defendant's assertion regarding a prior relationship with V.P. at trial, and based on its verdict, did not find Defendant's testimony to be credible.
Further, we reject Defendant's third assertion that the State violated its ethical obligations by withholding the victim's full name from defense counsel prior to trial. The record does not reflect that defense counsel objected to the State's discovery redactions pursuant to La. C.Cr. P. art. 729.7.[39] Defendant, also, did not present any evidence that the State knew that he and V.P. knew each other and failed to disclose this evidence.
We also reject Defendant's fourth allegation. The record reflects that the district court indicated that it would not make a decision on Defendant's motion for continuance when it was urged by the defense counsel. The defense counsel never re-urged its request for continuance. Thus, Defendant's assertion that the district court denied its motion of continuance is erroneous.
Based on the aforementioned, we find that the district court did not abuse its discretion in denying Defendant's motion for a new trial. Thus, we find this assignment of error also lacks merit.
Assignment of Error No. 3
In Defendant's third assignment of error, he argues that his right to effective assistance of counsel, pursuant to the Sixth Amendment of the United States Constitution, was violated.
Generally, ineffective-assistance-of-counsel claims are more properly raised in an application for post-conviction relief, where the district court can conduct a full evidentiary hearing on the matter if warranted. State v. Leonard , 2018-0142, pp. 20-21 (La. App. 4 Cir. 12/26/18), 262 So.3d 378, 391 (citing State v. Leger , 2005-0011, p. 44 (La. 7/10/06), 936 So.2d 108, 142 ). A narrow exception to this general rule exists "where the record contains evidence sufficient to decide the issue, and it is raised on appeal by an assignment of error, courts may consider the issue in the interest of judicial economy." State v. Paulson , 2015-0454, p. 9 (La. App. 4 Cir. 9/30/15), 177 So.3d 360, 367 (See also State v. Potter , 591 So.2d 1166 (La. 1990) ). However, we do not find that the record provides sufficient evidence to ascertain whether Defendant's ineffective assistance of counsel claim is meritorious. He can raise it in a post-conviction relief application.
Thus, we pretermit discussion of this assignment of error.
Assignment of Error No. 4
In Defendant's fourth assignment of error, he argues La. Const. Art. I § 17, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[40] He further argues *88 that, since La. Const. Art. I § 17 has been amended, the provision should be retroactively applied in this matter; averring that the ten-to-two jury verdict should be vacated.
La. Const. Art. 1 § 17 states, in pertinent part, that:
A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment may be confinement at hard labor or confinement without hard labor for more than six months shall be tried before a jury of six persons, all of whom must concur to render a verdict. (Emphasis added).
Louisiana follows the general rule that "a constitutional provision or amendment has prospective effect only, unless a contrary intention is clearly expressed therein." State v. Cousan , 1994-2503, pp. 17-18 (La. 11/25/96), 684 So.2d 382, 392-393. Further, La. C.Cr. P. art. 782 provides that the amendment to La. Const. Art. I § 17 requiring unanimous juries does not have retroactive effect.
The crime in this instant case occurred in January 1990 and Defendant was convicted in December 2017, both of which were prior to January 1, 2019. The Louisiana Supreme Court has not ruled that non-unanimous jury verdicts for crimes committed prior to January 1, 2019, as unconstitutional.[41]
Thus, we find this assignment of error lacks merit.
Assignment of Error No. 5
In Defendant's fifth and final assignment of error, he argues that his Eighth Amendment right to the United States Constitution was violated when the district court assessed $ 57,387.00 in prosecution costs and court costs against him. Defendant argues that assessment of the prosecution costs and court costs essentially punishes him for exercising his right to a trial, and will inadvertently impact his family and heirs. Thus, he contends that the assessment of the prosecution costs and court costs, along with his sentence, constitutes an excessive sentence. We agree.
The Supreme Court of the United States established that the Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. Taken together, these Clauses place 'parallel limitations' on 'the power of those entrusted with the criminal-law function of government.' "
*89 Timbs v. Indiana , --- U.S. ----, 139 S.Ct. 682, 687, 203 L.Ed.2d 11 (2019). Moreover, "[t]he Eighth Amendment's Excessive Fines Clause is incorporated under the Fourteenth Amendment's Due Process Clause, and thus enforceable against the States..." Id.
In Louisiana, it is a well-established rule that, while a "trial court has broad discretion to impose costs in this context, the discretion is not unlimited. The Louisiana Constitution limits a court's power to impose fines and costs when those costs are excessive or unreasonable." State v. Griffin , 2014-1214, p. 8 (La. 10/14/15), 180 So.3d 1262, 1269. To constitute an excessive sentence, a court must find that "the penalty is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and therefore, is nothing more than the needless imposition of pain and suffering. " (Emphasis added.) Id. , p. 8, 180 So.3d at 1270 (citing State v. Guzman , 1999-1753, p. 15 (La. 5/16/00), 769 So.2d 1158, 1166. "These limitations on a trial court's discretion protects defendants from excessive or unreasonable penalties." Id.
This issue was addressed in State v. Rideau, 2005-1470 (La. App. 3 Cir. 11/2/06), 943 So.2d 559. In Rideau , the defendant appealed the district court's denial of his motion to vacate an order assessing court costs and indigent defense against him in the amount of $ 127, 905.45. The Louisiana Court of Appeal, Third Circuit ("Third Circuit") granted the defendant's motion and vacated the district court's order. The Third Circuit reasoned that "the total amount of costs [the defendant] has been ordered to pay is grossly disproportionate to any court costs ever imposed on any criminal defendant in this State, indigent or non-indigent, who has served the maximum term of imprisonment." Id. , 2005-1470, p. 20, 943 So.2d at 572. Defendant, in this present case, was convicted of one count of aggravated kidnapping, in violation of La. R.S. 14:44, and one count of aggravated rape, in violation of La. R.S. 14:42, and received the maximum sentence on both counts.[42]
We find this case very instructive in the instant matter. In the district court's ex proprio order, pursuant to La. C.Cr. P. art. 887(A), it ordered that Defendant pay all of the costs associated with the prosecution and proceedings, upon a determination that Defendant was financially able to do so.[43] (Emphasis added). The State provided an itemized list of prosecution expenses amounting to $ 57,100.00. The statutory court costs amounted to $ 287.00. All of these fees were assessed against Defendant, totaling $ 57,387.00.
La. C.Cr. P. art. 887(A) provides, in pertinent part, that:
A. A defendant who is convicted of an offense or is the person owing a duty of support in a support proceeding shall be liable for all costs *90 of the prosecution or proceeding, whether or not costs are assessed by the court, and such costs are recoverable by the party or parties who incurred the expense...
"The phrase 'costs of prosecution or proceeding' as it appears in La.Code Crim.P. art. 887(A) does not express an intent by the legislature to authorize the recoupment of 'every' costs incurred by the State in maintaining the judicial system. (Emphasis added.) Rideau , 2005-1470, p. 18, 943 So.2d at 571. Moreover, "when court costs are imposed in felony convictions cases, these costs rarely exceed $ 1,500.00..." Id. , 2005-1470, p. 21, 943 So.2d at 572.
While we acknowledge the district court's discretion in this matter, we must distinguish that the court's power to impose costs and fines are limited. Griffin , p. 8, 180 So.3d at 1269. We impart that the exercise of a district court's discretion must remain equitable even though Defendant is not an indigent person. "Due process commands the even-handed treatment in the application and enforcement of laws." Rideau , 2005-1470, p. 24, 943 So.2d at 574-5. Again, we note that Defendant is serving the maximum sentence for both convictions. Thus, we find the imposition of all of the prosecution costs, in the amount of $ 57,100.00, against Defendant to be constitutionally prohibited, as cruel and unusual punishment, as contemplated by the Eighth Amendment to the United States Constitution, in light of the fact that he was sentenced to the maximum sentence allowed by law-life imprisonment.
As to the court costs, we find these costs are permissible, because they are reasonable and not excessive as contemplated by La. C.Cr. P. art. 887(A). See also Griffin , 2014-1214, p. 13, 180 So.3d at 1272-3, wherein the court stated "so long as the defendant has sufficient notice of the imposition of such costs, and as long as the costs are reasonable and not excessive, costs of prosecution...may be imposed upon convicted defendants, as set forth in the articles." Id. , 2014-1214, p. 14, 180 So.3d at 1273. Here, the court records reflect that Defendant did receive sufficient notice of the imposed costs and was afforded a contradictory hearing. We do not find the imposition of the statutory court costs in the amount of $ 287.00 to be excessive.
Accordingly, we find the district court abused its discretion when it assessed all prosecution costs against Defendant. Thus, we reverse the district court's ruling regarding the imposition of prosecution costs in the amount of $ 57,100.00. However, the district court retains the authority to enforce the statutory court costs associated with these proceedings in the amount of $ 287.00.
CONCLUSION
For the aforementioned reasons, the district court's judgment assessing prosecution costs against Defendant in the amount of $ 57,100.00 is reversed, but the statutory court costs assessed against Defendant are affirmed. Defendant's conviction and sentence are affirmed.
AFFIRMED, IN PART, AND REVERSED, IN PART
BELSOME, J., CONCURS IN PART AND DISSENTS IN PART
BELSOME, J., CONCURS IN PART AND DISSENTS IN PART
I respectfully concur in the majority opinion, except as to the reversal of the prosecutorial costs.
Before assessing prosecutorial costs, the trial court issued an ex proprio motu order notifying the parties of his intent to assess *91 the defendant the costs of prosecution pursuant to La. C.Cr.P. art 887.[1] The court ordered the District Attorney to compute the costs and submit its assessment to the defendant and the court. After a hearing, the trial court assessed $ 57,387.00 in costs, including prosecutorial and court costs.
A review of the transcript from the hearing reflects that the trial court recognized the Defendant's ability to pay the costs of prosecution. In particular, the Defendant owned several pieces of real estate worth approximately $ 300,000.00, and posted a $ 150,000.00 property bond. Moreover, the Defendant was convicted of aggravated kidnapping and aggravated rape, which are violent crimes. Although the assessment may be high, under these circumstances, I do not find that the trial court abused its discretion by assessing costs against the Defendant. See State v. Griffin , 14-1214, p. 6 (La. 10/14/15), 180 So.3d 1262, 1268 (where the Louisiana Supreme Court found that it was within the discretion of the trial court to impose a broad category of costs on a convicted criminal defendant pursuant to article 887(A) ). Therefore, I would affirm the trial court's judgment in its entirety.

The court record before this Court reflects that Defendant is also known by the alias, Tyrone Williams.

Defendant was charged, indicted, and convicted of aggravated rape in violation of La. R.S. 14:42, which was amended as first degree rape, effective August 1, 2015. The minute entry erroneously refers to the offense as a first degree rape.
However, La. R.S. 14:42(E) provides that:
For all purposes, "aggravated rape" and "first degree rape" mean the offense defined by the provisions of this Section and any reference to the crime of aggravated rape is the same as a reference to the crime of first degree rape. Any act in violation of the provisions of this Section committed on or after August 1, 2015, shall be referred to as "first degree rape".
(Emphasis added).

La. R.S. 14:44 states, in pertinent part, that:
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.

§ 42. Aggravated rape, LSA-R.S. 14:42
A. Aggravated rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.
(5) When two or more offenders participated in the act.
B. For purposes of Paragraph (5), "participate" shall mean:
(1) Commit the act of rape.
(2) Physically assist in the commission of such act.
C. Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence."

La. R.S. 46:1844(W) prohibits the public disclosure of the names, addresses, or identities of crime victims under the age of eighteen (18) and of all victims of sex offenses, but instead authorizes the use of initials and abbreviations. In the "interest of protecting minor victims and victims of sexual offenses," victims and defendants or witnesses whose names can reveal the victims' identities are referred to only by initials. State v. Williams , 2017-0544, p. 1, fn. 1 (La. App. 4 Cir. 3/14/18), 240 So.3d 355, 357 (citing State v. Ross , 2014-84, p. 3, n. 3 (La. App. 5 Cir. 10/15/14), 182 So.3d 983, 985 ).

It should be noted that Defendant contests the credibility of the DNA evidence introduced by the State in assignment of error number one.

La. C.E. art. 412.2 states, in pertinent part, that:
When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.

In November 2010, the victim, who rented an apartment from Defendant, filed a complaint with the NOPD reporting that Defendant attempted to rape her in her apartment. A police report, in the record before this Court, indicates that Defendant knocked on the door of C.T.'s apartment and forced entry. Upon gaining entry, Defendant picked C.T. up and carried her into her bedroom where he attempted to force vaginal/penile sex on her. C.T. provided that she continued to fight him off until he stopped and left the apartment.

It should be noted that Defendant did not present any evidence of the alleged text messages between himself and C.T. to corroborate this allegation.

Officer Williams testified that C.T. reported the incident approximately thirty (30) hours after it occurred and expressed she was embarrassed to see a doctor to receive an examination.

Ms. Murphy explained that the DNA samples received in this matter were named F-33538.

Ms. Murphy indicated that the staff was permitted access to the laboratory three (3) days after Katrina to access the damage, which was minimal. Subsequently, the staff was able to work out of a remote office in Baton Rouge, Louisiana.

The DNA test results were marked as the State's Exhibit 4.

Ms. Murphy explained that contamination of a DNA sample occurs when foreign DNA is introduced into a forensic DNA sample. She explained that there are several protocols in place to prevent such occurrence. She explained that contamination and degradation are commonly confused by the public.
As to degradation, she explained that process begins to occur as soon as DNA leaves the body, or in this case, as soon as a rape kit sample is taken from the body. This process is accelerated with heat, humidity, or any other adverse environmental condition it is stored at. However, if degradation of a DNA sample sets in, it does not create a different profile. Rather, the test results will yield "NR," which indicates that the sample did not generate any test results. In this case, she explained that degradation is very difficult to set in with sperm cells because they are "robust in nature." She explained that the outer cell walls protect the DNA inside of the sperm cell from being degraded; thus, in this case, there was enough male DNA from the vaginal swab to be tested to yield results.

V.P. surmised that it was around 1:00 a.m. when she left her friend's home.

V.P. testified that the initial police station she was taken to refused to see her, so she was transported to another police station.

V.P. indicated that her former boyfriend, Christopher Harris, informed her that an inmate at the jail where he was housed started bragging about a rape that mirrored V.P.'s rape. He surmised that this man was the one who committed the rape against V.P. and gave her the man's name.

Upon contacting the police and providing the information from her boyfriend, the police presented V.P. with several photographs. She testified that, based on the description provided to her, she identified Mr. Quinn as the attacker.

V.P. indicated that her identification of this man was solely based on the information provided to her by her former boyfriend.

V.P. was notified by Detective Orlynthia Miller-White of the NOPD's Special Victims Section of the Sex Crimes Unit.

At trial, V.P. testified that she was made aware that her sister and Defendant's older sister were high school friends. Also, after reviewing a photograph of Defendant, she recounted that he "looked familiar" and vaguely remembered that he lived in her childhood neighborhood. However, she reiterated that she did not personally know Defendant, could not identify Defendant as her attacker, and she never had a consensual sexual relationship with Defendant.

On cross-examination, Defendant's defense counsel questioned whether V.P. knew that her sister had testified on Defendant's behalf in an unrelated case that occurred in September 1990, to which she denied any knowledge. On re-direct examination, V.P. testified that, despite her lack of knowledge regarding her sister's involvement in this unrelated case, her sister was not aware that Defendant was her attacker. She stated that no one at the time knew, including herself, that Defendant committed this crime against her.

He testified that the report evidenced the time and date as 1:45 a.m. on January 31, 1990.

Dr. Ross explained that if a victim showers or douches after an assault, it may interfere with the evidence collected. In these instances, he explained that the evidence will still be collected; however, the results may be affected.

Dr. Ross explained that, during the examination, a black light is used to observe if there is any body fluid on a victim.

Dr. Ross was subject to cross-examination; however, the defense merely questioned him to confirm or deny whether he could attest to the handling of the evidence once it was turned over to NOPD, which Dr. Ross denied.

The State called Lieutenant Arnold Williams ("Lt. Williams"), the supervisor in NOPD's Sex Crime Unit, who testified to the general process of a CODIS case or DNA rape case. He explained that investigations begin upon receipt of a CODIS match notification letter from the Louisiana State Police ("State Police") indicating that DNA evidence from a rape kit has been matched in the database with a known person. Once the letter is provided, the detectives on these cases turn to locating the victim. Once the victim is located and provided with the name of the identified suspect, the detectives obtain a search warrant to get a buccal swab from the suspect if the victim is unfamiliar with the named suspect. This swab is then provided to the State Police to confirm "the hit" provided in the original DNA report. He explained this confirmation procedure is utilized in place of a line-up identification procedure.

The defense attempted to attack this assertion by indicating that two reports evidencing the results of Defendant's DNA was provided by the State Police-one in 2011 and the other in 2017. The State introduced the 2011 report as State Exhibit No. 11 and defense introduced the 2017 report as Defense Exhibit 6. However, Sgt. Jarrott testified that he was unaware of the second report but noted that the reports were identical. Also, he noted the only difference between the 2011 and 2017 reports was the statistical analysis. The 2011 report evidenced a 9.2 billion chance as opposed to 8.5 billion chance of the DNA profile belonging to another.

Ms. Montgomery provided that NOPD's DNA lab uploads DNA profiles obtained from the State Police-operated state DNA index system. In turn, these profiles are uploaded to the federal CODIS system.

Ms. Montgomery recalled that ReliaGene, which was located in Elmwood at that time, did not flood or suffer water damage as a result of Hurricane Katrina. She confirmed that the biological evidence in this case was not compromised in any manner. Moreover, Ms. Montgomery testified, that even assuming a sample had been compromised, the results would result in no profile as opposed to an incorrect one. This assertion directly opposed Defendant's argument that the DNA sample was likely contaminated, resulting in an inaccurate result.

On cross-examination, the defense asked Ms. Montgomery to clarify whether there was more than one male as a contributor, to which Ms. Montgomery denied. She clarified that the male DNA profile contained two different contributors, but the sample was from one male, which has been identified as Defendant.

Mr. Simmers explained, in reference to the statistical analysis, the discrepancy between the 2011 report (State's Exhibit No. 1) and the 2017 report (Defense's Exhibit 6). He provided the report was reissued to reflect the updated changes instituted by the Federal Bureau of Investigation ("FBI"). However, he affirmed that no new evidence was submitted or new comparisons made.

On cross-examination, he referenced the 2010 rape allegation of his tenant and insisted that he had never tried to rape her or actually raped anyone. He explained that, in an attempt to prevent eviction, the victim in this case began to text him. He was not clear as to the intent of these text messages, but attempted to insinuate that allegations that she was offering a "dinner" in exchange for rent payment.

In post-trial motions, the prosecutor informed the trial judge that, contrary to Defendant's representation, the victim's name was revealed during voir dire to determine whether any prospective juror knew her. However, only two excerpts from the voir dire are contained in the record and neither indicates that the victim was identified by name.

In accordance with La. C.Cr.P. art. 920, all appeals are reviewed for errors patent. State v. Anderson , 2008-962, p. 2 (La. App. 3 Cir 2/4/09), 2 So.3d 622, 624.

To note again, V.P. initially provided that her attacker was a black male with a mustache, about 5'8?-5'9? and about 160-180 pounds.

Valerie Jackson's affidavit attested she could corroborate Cornelius Warner's assertion that Cornelius told her that the defendant told him that he (Defendant) had a sexual relationship with V.P. Ms. Jackson did not indicate she had independent knowledge that V.P. and Defendant had a prior relationship.

Cornelius Warner's affidavit indicated that on January 1, 1990, he knew that Defendant and V.P. had a prior consensual sexual relationship. However, during the hearing on the motion for new trial, the State introduced evidence discrediting the contents of Cornelius Warner's affidavit, i.e., Cornelius had been in jail since 1989 and was not around when the rape occurred.

La. C.Cr. P. art. 729.7 provides, in pertinent part, that:
Notwithstanding any other provision of law to the contrary, the district attorney or the defendant may delete or excise from any information required to be disclosed herein any information which identifies a witness if such party believes the witness's safety may be compromised by the disclosure. If a party objects to the deletion or excision, he must do so by written motion. The court shall maintain the deletion or excision if, at an ex parte proceeding which shall be recorded and maintained under seal, the party excising or deleting such information makes a prima facie showing that the witness's safety may be compromised by the disclosure.

We note that, at the time of Defendant's trial in 2011, La. Const. Art. I § 17 provided that non-unanimous jury verdicts for capital crimes were constitutional. The amendment to La. Const. Art. I § 17 now provides for unanimous jury verdicts.

It should be noted that State v. Ramos , is currently before the Supreme Court of the United States to address whether a state criminal defendant has the right to a unanimous jury verdict pursuant to the Sixth Amendment of the United States Constitution as incorporated through the Fourteenth Amendment of the United States Constitution. State v. Ramos, 2016-1199 (La. App. 4 Cir. 11/2/17), 231 So.3d 44, writ denied , 2017-2133 (La. 6/15/18), 257 So.3d 679, and writ denied sub nom. State ex rel. Evangelisto Ramos v. State, 2017-1177 (La. 10/15/18), 253 So.3d 1300, and cert. granted , --- U.S. ----, 139 S.Ct. 1318, 203 L.Ed.2d 563 (2019).

La. R.S. 14:42 provides, if the district attorney seeks a capital verdict, an offender shall receive either the maximum sentence of death or life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. If the district attorney does not seek a capital verdict, the maximum sentence shall be life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. In the instant matter, the district attorney did not seek a capital verdict; thus, Defendant was sentenced to the maximum sentence permissible-life imprisonment.

Notably, the district court's determination of Defendant's financial position was predicated on the conclusion that Defendant had approximately $ 300,000.00 of assets and was able to post a property bond in the amount of $ 150,000.00 for bail.

La. C. Cr. P. art. 887(A) provides in part:
A defendant who is convicted of an offense ... shall be liable for all costs of the prosecution or proceeding, whether or not costs are assessed by the court, and such costs are recoverable by the party or parties who incurred the expense. However, such defendant or person shall not be liable for costs if acquitted or if the prosecution or proceeding is dismissed. In addition, any judge of a district court, parish court, city court, traffic court, juvenile court, family court, or magistrate of a mayor's court within the state shall be authorized to suspend court costs.